STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CARL C. LOW, *ET AL.*, DEFENDANTS-APPELLANTS.

THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CLOSTER VILLAGE, INC., SIDNEY V. STOLDT AND CARL C. LOW, DEFENDANTS, AND LOUIS ANTOVEL, DEFENDANT-APPELLANT.

Argued February 21, 1955—Decided March 28, 1955.

*Mr. James A. Major* argued the cause for appellant Low.

*Mr. Max L. Rosenstein* argued the cause for appellant Antovel.

*Mr. Guy M. Calissi,* Bergen County Prosecutor, argued the cause for respondent.

The opinion of the court was delivered by
WILLIAM J. BRENNAN, JR., J.   The Appellate Division, under the authority of *R. R.* 3:5–5(*b*)(6)(*a*), allowed defendants Low and Antovel leave to appeal from an order of the Bergen County Court denying their motions to dismiss nine indictments.   The opinion of Judge O'Dea in the County Court is reported *sub nom. State v. Closter Village, Inc.,* 31 *N. J. Super.* 566 (1954).   We certified the appeals here on our own motion under *R. R.* 1:10–1(*a*).

The indictments also name Closter Village, Inc., and Sidney V. Stoldt.   Stoldt, Low and Antovel were the officers, directors and stockholders of Closter Village, Inc., the developer of a large-scale building project in the Borough of

Closter. The venture failed and persons who had made down payments under contracts with Closter Village, Inc., for the purchase of sites and the construction of homes thereon complained that their monies were fraudulently diverted from the purposes for which they were paid.

The complaints resulted in the indictments before us charging the corporation and the three individuals with offenses under *R. S.* 2:124–16 and *R. S.* 2:124–11. Between the dates of the alleged commission of the offenses charged in the indictments and the date the indictments were returned, the statutes were respectively superseded by *N. J. S.* 2*A*:102–10 and *N. J. S.* 2*A*:102–5 as part of the revision of *Titles* 2 and 3 of the *Revised Statutes* adopted upon the recommendation of the Advisory Committee on the Revision of Statutes, of which Judge, then Senator, Clapp was chairman. *Title* 2*A* became effective on January 1, 1952 under the terms of *L.* 1951, *first spec. sess., c.* 344, *sec.* 12, *p.* 1455.

Seven of the indictments, varying only as to the complaining witnesses, lot and block numbers and amounts of money, charge the offense under *R. S.* 2:124–16, which provided:

"All moneys received by a contractor from the owner or mortgagee of real estate or any leasehold or other interest therein, while a building is being erected, constructed, completed, altered, repaired or having an addition made thereto, are hereby declared to be trust funds in the hands of such contractor to be applied to the amount of all claims due or to become due and owing from such contractor to all persons furnishing labor or materials to him for the erection, construction or completion of the building or any alteration, repair or addition thereto, and any other reasonable and necessary charge in connection with the carrying on and completion of the work on the building. Any contractor or any officer, director or agent of such contractor who pays or consents to the appropriation of such funds for any other purpose prior to the payment of all claims and charges for the payment of which such funds constitute a trust fund as above provided, shall be guilty of a misdemeanor."

The indictments for the offense are in the following form:

"That Closter Village,. Inc., a corporation of the State of New Jersey, Sidney V. Stoldt, Carl C. Low and Louis Antovel, they then being officers and directors of the said Closter Village, Inc., * * *

on or about, during and between August 22, 1950 and July 1, 1951 * * * being then and there contractors, and that as such they did enter into a contract with (names of complaining witnesses) for the construction of a certain dwelling house upon certain lands known as Lot (number) Block (number) on 'Map of Closter Village, Section 4, Closter, Bergen County, N. J.,' and that they did receive from the said (names of complaining witnesses), purchasers under said contract, the sum of $ (amount) in lawful money of the United States of America for the purpose of paying all claims due or to become due and owing from them the said contractors, for labor and materials incident to the construction of the dwelling house aforesaid, but despite the specific purpose for which the aforesaid sum of $ (amount) was placed in their hands, the said Closter Village, Inc., a corporation of the State of New Jersey, Sidney V. Stoldt, Carl C. Low, and Louis Antovel, being then and there officers and directors of Closter Village, Inc., did willfully and unlawfully appropriate, or consent thereto, the aforesaid monies for purposes other than the payment of labor and material due or to become due from them for the construction of the aforesaid dwelling house prior to the payment of all claims and charges, for the payment of which such funds constitute a trust fund under the statute in violation of *R. S.* 2:124–16 * * *."

Defendants contend that the indictments were fatally defective in three respects: (1) That the allegation that the defendants entered "into a contract with" the complaining witnesses "for the construction of a certain dwelling house * * * and that they did receive" a sum of money from said complaining witnesses, "purchasers under said contract," does not charge the ingredient of the statutory offense that the accused received moneys "from the owner or mortgagee of real estate or any leasehold or other interest therein." (2) That there is no allegation negativing the existence of unpaid creditors in addition to laborers and materialmen, such, for example, quoting from Low's brief, as may have been concerned with "the necessary work of laying out roads, installing utilities and the like * * *, salaries for supervisory personnel, legal expenses incident to the search of title and financial expense for the obtaining of money." The argument is that such an allegation is requisite in the indictments as the funds constituted trust funds by the statute are held on trust not alone for claimants for labor and materials, but also for "any other reasonable and necessary charge in connection with the carrying on and completion of

the work of the building." And (3) that the indictments fail to allege that the defendants received the moneys, as the statute requires, "while a building is being erected." It is urged that this requisite is not met by the allegation that the moneys were received "for the purpose of paying all claims due or to become due  *  *  *  incident to the construction of the dwelling house  *  *  *."

We agree with Judge O'Dea that there is no merit in defendants' contentions.

The statute has its source in *L.* 1932, *c.* 104, *p.* 177, which contained three substantive sections. The first section concerned misappropriation by a mortgagor of funds received under a construction mortgage and became *R. S.* 2:124–15. The second section became *R. S.* 2:124–16, with which we are concerned here. The third section dealt with misappropriation of funds paid to a subcontractor for building purposes and became *R. S.* 2:124–17. The object of the 1932 law, plainly evident in its phraseology and confirmed by the introducer's statement appended to 1932 Assembly Bill 139, was to make the funds mentioned therein trust funds and thereby require mortgagors, contractors and subcontractors receiving moneys for the construction, alteration, or repair of buildings, to apply such moneys for the purposes specified in the several sections and, under penalty of being guilty of a misdemeanor, not for any other purpose prior to the making of the payments therefrom authorized by the statute.

Answering defendants' first contention, in light of the statute's purpose, a claimant upon the fund would obviously have no concern with the precise nature of the interest in the property of the person who is paying to have the building constructed. And in light of that purpose also, we cannot conclude, as defendants argue we should, that the Legislature intended to limit the safeguards of the statute to cases where the contractor received the money from the owner or mortgagee or lessee of the fee. The vendee under a contract for the purchase of real estate is the owner of an interest in such property. *Palisade Gardens, Inc., v. Grosch,* 120 *N. J. Eq.* 294 (*Ch.* 1936), affirmed 121 *N. J. Eq.*

240 (*E. & A.* 1937); *Haughwout and Pomeroy v. Murphy,* 22 *N. J. Eq.* 531 (*E. & A.* 1871). We are satisfied that the crime embraces the misappropriation by a contractor of funds received from persons having a contract for the purchase of the property upon which the building is to be constructed. Such a person satisfies the description of "the owner  *  *  * of  *  *  *  any interest" in real estate, which is the meaning to be given the statute, we think, in the light of its purpose.

We have not overlooked the deletion of the italicized words in the clause "from the owner or mortgagee of real estate *or any leasehold or other interest therein*" made in the revision of *R. S.* 2:124–16 into *N. J. S.* 2A:102–10. In our view, the deletion was made pursuant to the general objective of the revisers, in Judge Clapp's words, "to boil down, to clarify, to eliminate the obsolete," *Foreword p. x,* 2A *N. J. S. A. Bk.* 1. When used in the revised statutes the words "real estate," unless otherwise expressly provided, or there is something in the subject or text repugnant to such construction, are to be interpreted as including "lands, tenements and hereditaments and all rights thereto and *interests therein,*" *R. S.* 1:1–2, as amended *L.* 1948, *c.* 4, *sec.* 1, *p.* 47; *L.* 1953, *c.* 4, *sec.* 1, *p.* 18. The deleted words were clearly surplusage under that definition.

Answering defendants' second contention, it is enough to refer to the specific allegation of the indictments that the defendants unlawfully appropriated the moneys *"prior to the payment of all claims and charges, for the payment of which such funds constitute a trust fund  *  *  *."* We have repeatedly said that the specification of the accusation requisite in an indictment is sufficient if it informs the accused of the nature of the offense charged so as to enable him to make an adequate defense as well as to avail himself of his conviction or acquittal to avoid the threat of double jeopardy. *State v. Winne,* 12 *N. J.* 152, 178 (1953); *State v. Witte,* 13 *N. J.* 598, 608 (1953), *certiorari* denied, *sub nom., Witte v. State of New Jersey,* 347 *U. S.* 951, 74 *S. Ct.* 675, 98 *L. Ed.* 1097 (1954), rehearing denied 347 *U. S.* 994, 74

*S. Ct.* 849, 98 *L. Ed.* 1127 (1954) ; *State v. Lefante,* 12 *N. J.* 505 (1953) ; *State v. Rios,* 17 *N. J.* 572 (1955). An indictment needs be only a written statement "of the essential facts constituting the offense charged," *R. R.* 3 :4–3 (*a*). These indictments, in charging that the alleged misappropriation occurred prior to the payment of "all" claims and charges for the payment of which the funds were held on trust, amply apprised the defendants that they were being charged with having improperly used the moneys before the payment of charges connected with the carrying on and completion of the work on the buildings. The difference between the instant indictments and that in *State v. Bleichner,* 11 *N. J. Super.* 542 (*App. Div.* 1951), relied upon by defendants, is that the indictment there failed in any wise to state this constituent element of the crime.

■ Answering defendants' third contention, we think the import of the allegation that the moneys were received by defendants "for the purpose of paying" construction claims is an allegation within the statutory contemplation that defendants received the moneys "while a building is being constructed." It would plainly flout the legislative intent to attribute to the statute a meaning which denied its application if construction was not actually begun at the time the contractor diverted the funds from trust purposes. Here again the revisers of the statute made a change. They substituted the words "for the purpose of having a building erected * * *" in *N. J. S.* 2A :102–10 for the words "while a building is being erected * * *" in *R. S.* 2 :124–16. This was obviously done not to broaden the scope of the offense but merely to clarify the expression of the legislative intent and leave no doubt that such was always the designed reach of the statute.

■ The other offense charged to the defendants is the violation of *R. S.* 2 :124–11, reading :

"Any consignee, factor, bailee, agent or servant, intrusted with the care or sale of any personal property, or intrusted with the collection or care of any moneys, who shall fraudulently take or convert the same, or the proceeds of the sale of the same, or any part

thereof, to his own use or to the use of any other person whatsoever, except the rightful owner thereof, shall be guilty of a misdemeanor."

The form of the two indictments under this statute is:

"* * * being then and there the agents of (names of the complaining witnesses) and as such entrusted with the care of certain moneys then and there the property of the said (the complaining witnesess), they did then and there fraudulently take and convert to their own use the sum of $(amount), moneys of the said (complaining witnesses) and lawful money of the United States of America, with intent to deprive the said (complaining witnesses) thereof, in violation of N. J. S. 2:124–11 * * *."

Defendants' sole argument addressed to these indictments is that as officers and directors of the corporation, the individual defendants could not be agents for the plaintiffs. But the brief on behalf of defendant Low concedes that "presumably it is technically possible for a corporation and three individual defendants to jointly receive money from a certain person." And see *State v. Carr*, 117 *N. J. L.* 245 (*Sup. Ct.* 1936), affirmed 118 *N. J. L.* 233 (*E. & A.* 1937). The indictments charge that the four defendants were the agents of the complaining witnesses and as such entrusted with the care of certain moneys then and there the property of the said complaining witnesses which the defendants did fraudulently take and convert to their own use, contrary to the statute. The indictments follow the statutory language and it is difficult to see how defendants could be more clearly apprised of the offense charged.

The brief of defendant Antovel suggests that he has not abandoned a point unsuccessfully urged in the trial court, namely, that both *R. S.* 2:124–11 and *R. S.* 2:124–16 were repealed upon the adoption of *Title 2A*, effective January 1, 1952, so that indictments under the statute were not possible after that date. Judge O'Dea correctly disposed of this argument by reference to *R. S.* 1:1–15 (expressly made applicable to *Title 2A* by *L.* 1951, *c.* 344, *sec.* 10) which provides that repeal or alteration of any statute under which an offense was charged does not bar indictment and prosecution for such offense, unless expressly so declared in the act

by which such repeal or alteration is effected; and the Legislature did not make that declaration in enacting *Title 2A.* Affirm.

VANDERBILT, C. J., and WACHENFELD, J., concurring in result.

HEHER, J. (dissenting). The indictments charge that Closter Village, Inc. and Stoldt, Low and Antovel, "they, then being officers and directors" of the corporation, "being then and there contractors," "as such did enter into a contract" with another "for the construction of a certain dwelling house upon certain lands known as Lot 11, Block 284 on 'Map of Closter Village, Section 2, Closter, Bergen County, N. J.' " (presumably lands of the corporation, yet there is no direct allegation of ownership), and "did receive" from such person, "purchaser under said contract," a given sum of money "for the purpose of paying all claims due or to become due and owing from them the said contractors, for labor and materials incident to the construction of the dwelling house aforesaid, but despite the specific purpose" for which the money "was placed in their hands," it was appropriated to other purposes in violation of the "trust" created by *R. S.* 2:124–16, now *N. J. S.* 2A:102–10.

But this was a contract of purchase pure and simple, unperformed no doubt because of the insolvency of the corporate land developer; and the purchaser was not as such "the owner or mortgagor of real estate or any leasehold or other interest therein" for whom a "building" was "being erected, constructed, completed, altered, repaired" or added to. The "interest," whatever it was and however it may be termed, arose from the contract of sale and purchase itself and the payment of the allegedly misappropriated money. There was no prior interest.

The court holds that the "vendee under a contract for the purchase of real estate is the owner of an interest in such property," citing *Palisade Gardens v. Grosch,* 120 *N. J. Eq.* 294 (*Ch.* 1936), affirmed 121 *N. J. Eq.* 240 (*E. & A.* 1937), and *Haughwout and Pomeroy v. Murphy,* 22 *N. J. Eq.* 531

(*E. & A.* 1871). But those cases concern a rule of equity, not of law; and we are here dealing with a highly penal statute that cannot be extended by importing into its definitive terms the purely equitable doctrine of conversion that "upon an agreement for the sale of lands, the contract is regarded, for most purposes, as if specifically executed. The purchaser becomes the equitable owner of the lands, and the vendor of the purchase money. After the contract, the vendor is the trustee of the legal estate for the vendee." *Haughwout and Pomeroy v. Murphy, supra.* A contract of sale is not a deed transferring title to the land; a contract of sale and purchase has in view the later execution of a deed conveying the title. We have here a mere executory contract to convey.

The deletion of the phrase "or any leasehold or other interest therein" from the subsequent revision of the Crimes Act, *N. J. S.* 2*A* :102–10, effective January 1, 1952, cannot, I submit, be dismissed as simply a "clarification" and "elimination" of the "obsolete," and "clearly surplusage under (the) definition" of the term "real estate" contained in *R. S.* 1937, 1 :1–2, as amended by *L.* 1948, *p.* 47, *L.* 1953, *p.* 18, as including "lands, tenements and hereditaments and all rights thereto and interests therein." This is but the general definition of the term applicable "unless it be otherwise expressly provided or there is something in the subject or context repugnant to such construction." Certainly, this general interpretive rule cannot be invoked to enlarge the category of crime denounced by the self-contained *section* 2*A* :102–10 of the Crimes Act. And it does not have in view a mere equitable interest represented by the doctrine of conversion.

It is well to remember here the cardinal rule that penal statutes are to be construed strictly against the State and favorably to the liberty of the citizen. Statutes creating and defining crimes cannot be extended by intendment. Purely statutory offenses cannot be established by implication. Before one can be punished criminally, his act must be plainly and unmistakably within the statute. *United States v. Resnick,* 299 *U. S.* 207, 57 *S. Ct.* 126, 81 *L. Ed.*

127 (1936); *Todd v. United States,* 158 *U. S.* 278, 15 *S. Ct.* 889, 39 *L. Ed.* 982 (1895).

The standards of certainty in statutes "punishing for offenses is higher than in those depending primarily upon civil sanctions for enforcement"; the crime "must be defined with appropriate definiteness"; there must be "ascertainable standards of guilt"; "Men of common intelligence cannot be required to guess at the meaning of the enactment"; and the vagueness may be from "uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt." *Winters v. People of State of New York,* 333 *U. S.* 507, 68 *S. Ct.* 665, 92 *L. Ed.* 840 (1948).

Definiteness in criminal legislation has its roots in the common law and in the due process clauses of the Fifth and Fourteenth Amendments. Judicial "enlargement of a criminal act by interpretation is at war with a fundamental concept of the common law that crimes must be defined with appropriate definiteness"; while the act should be interpreted "so as * * * to give full effect to its plain terms," there can be no departure from "its words and context." *Pierce v. United States,* 314 *U. S.* 306, 62 *S. Ct.* 237, 86 *L. Ed.* 226 (1941). Compare *Jordan v. De George,* 341 *U. S.* 223, 71 *S. Ct.* 703, 95 *L. Ed.* 886 (1951); also *United States v. Cardiff,* 344 *U. S.* 174, 73 *S. Ct.* 189, 97 *L. Ed.* 200 (1952); *Musser v. State of Utah,* 333 *U. S.* 95, 68 *S. Ct.* 397, 92 *L. Ed.* 562 (1948).

And doubt as to the meaning of the statute is to be resolved against the State; the terms are to be understood in the narrower sense unaided by the strictly equitable doctrine of conversion.

Does not the excision from the current revision, *N. J. S.* 2A:102–10, of the phrase "or any leasehold or other interest therein" suggest legislative awareness of the vice of generality in the terms, so much so as to have in major part no determinate meaning? At all events, the statute was thereby limited in its trust concept to moneys received by a "contractor" from the "owner or mortgagee" of real estate; and thus the class was specifically confined to the owners and mortgagees

of real estate. There is no indication of a purpose to include contracts of sale and purchase, by borrowing the equitable doctrine of conversion. And this would seem to serve as a legislative exposition of the true sense and significance of the earlier terms. The words cannot be enlarged beyond their clear import. *United States v. Resnick, supra.* The scope of criminal statutes should not be extended to conduct not clearly within their terms. *United States v. Williams,* 341 *U. S.* 70, 71 *S. Ct.* 581, 95 *L. Ed.* 758 (1951).

As to the two indictments for conversion, neither the corporation nor its named officers were in this factual context the "agents" of the vendee "entrusted with the care" of the particular moneys paid to the vendor corporation under the contract of purchase and sale within the intendment of *R. S.* 2:124–11, and so they cannot be criminally answerable for the fraudulent conversion so laid to them. Since it is conceded that they have no other basis, I would vacate these indictments as groundless in fact.

I would reverse the order under review and remand the cause with direction to quash the indictments.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice HEHER—1.